**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **BRYANT DAVIDSON,** | * | |
| **Plaintiff** | * | |
| **v** | * | **Civil Action No. GJH-19-885** |
| **DR. SADIK ALI,** *et al.* | * | |
| **Defendants** | * | |
| | *** | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Bryant Davidson is incarcerated at Western Correctional Institution ("WCI").  He brings this civil rights action against Medical Defendants, Dr. Sadik Ali, Dr. Tadesse Tedla, and Corizon Health, Inc., claiming they failed to provide him constitutionally adequate medical care. Pending is the Medical Defendants' renewed Motion to Dismiss or, Alternatively for Summary Judgment.  ECF 20, 51.[1]  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For reasons discussed below, the Medical Defendants' Motion will be granted.

**I.  BACKGROUND**

**A.  Procedural Background**

Throughout this proceeding, Davidson has insisted his legal mail has been tampered with or that he is not receiving his legal mail, including his copy of the Medical Defendants Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. [2]  As a result, this Court twice directed the Medical Defendants to resend their dispositive motion to Davidson.  ECF 26, 41.  On January 29, 2021, the Medical Defendants, as ordered by this Court, mailed a third copy of their

---

[1]  Davidson did not file a Reply although notified that he may do so and despite multiple attempts to provide him with a copy of the Motion.
[2]  *See e.g.* ECF 24, 33, 35, 44.

Motion to Dismiss or, in the Alternative, Motion for Summary Judgment to Davidson at the Baltimore Central Booking and Intake Center.[3]  That Motion was mailed to Davidson via UPS Next Day Air.  ECF 43-1.  On February 23, 2021, the Motion was returned to counsel for the Medical Defendants with a notation on the package that Davidson had refused to accept it. ECF 43-2.  On April 1, 2021, Davidson sent correspondence to the Court that he has received no mail since April of 2020. ECF 44.

In view of Davidson's repeated concerns about his mail and the Medical Defendants' three separate efforts (including the initial mailing) to send the dispositive motion to him, on January 14, 2022, this Court ordered the Clerk to mail Davidson a copy of the Motion and attachments to be personally delivered to Davidson with the delivery of the package recorded on video. ECF 49.  The Clerk sent a sealed box containing the dispositive motion and attachments to Davidson at WCI in care of Case Manager Jason Clise.  On January 31, 2022, Clise took the box to Davidson's cell for delivery.  Decl. of Jason Clise, ECF 53.  Davidson, however, refused delivery.  The attempted delivery was captured on a video and audio recording and described in Clise's declaration, which were provided to the Court pursuant its January 14, 2022 Order. ECF 49, 53, 53-4.  The video shows Clise asking Davidson to identify himself, informing Davidson that the box from the Court was addressed to Davidson, and holding the box so that it can be seen by Davidson.  Davidson, however, refused to accept the box or to sign an acknowledgement of receipt. ECF 53-1.  Additionally, Davidson refused to sign his name or write his reasons for refusing the box.[4] ECF

---

[3]  In correspondence received by the Clerk on April 1, 2021, Davidson informed the Court that he was transferred to Western Correctional Institution on March 9, 2021. ECF 44.

[4]  Davidson's reasoning for refusal is circular and confusing.  His responses on the video/audio recording suggest, as best as can be discerned, that Davidson refused to accept the box sent by the Clerk containing the dispositive motion because Davidson believed he had previously received late delivery of a court order in September (no year specified), Lieutenant Smith threatened him if he accepted any legal mail, and the January 31, 2022, attempted delivery was being recorded.  This is the first time Davidson has mentioned any threat or Lieutenant Smith, who is not a defendant in this action.  Davidson's reference to late receipt of a September Court Order appears to contradict his earlier assertion that

53, 53-1. Davidson's refusal was witnessed by Clise and Correctional Officer II Wilburn. *Id*. WCI staff have since returned the unopened box to the Court. The copy of the January 14, 2022 Order sent to Davidson was returned to the Clerk on February 8, 2022, with the envelope marked "refused." ECF 54.

### B. Plaintiff's Allegations

Davidson alleges that on February 25, 2019, he was in a car accident, arrested, and taken directly to the Baltimore Central Booking and Intake Center ("BCBIC"), instead of the emergency room.[5] He claims that he was assigned to a top bunk, had a seizure which caused him to fall to the floor, was awakened by Officer Early repeatedly slapping him, and then had to wait several hours before he was taken by ambulance to the hospital. ECF 3, 4, 4-1; ECF 4-1 at 3.[6] Davidson was admitted to the University of Maryland Medical Center ("UMMC") where medical providers allegedly diagnosed him with nerve damage to the spine and paralysis on his left side. ECF 3 at 2.

Davidson alleges the hospital physical therapist recommended a wheelchair for him, but he was discharged from UMMC instead with a walker. *Id*. He claims this caused him later to fall and sprain his ankle at BCBIC while being assisted with moving from his bed to his walker. When Davidson asked to see Dr. Tedla, he was informed that Tedla said he would see Davidson the following day. *Id*. at 3. Davidson alleges that his ankle swelled so much that he was sent to the hospital as an emergency, where he was diagnosed with a severe ankle sprain. *Id*.

Davidson was discharged from UMMC to the infirmary at the Metropolitan Transition

---

he has not received mail since April of 2020.
[5] Davidson's Amended Complaint, ECF 4, 4-1, and first supplement, ECF 3, are treated as the operative complaint. ECF 8 at 3.
[6] Exhibit page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

Center ("MTC").  He asserts that he told Dr. Ali at MTC about his pain and difficulty walking, but Ali sent him back to BCBIC without alerting custody staff that Davidson needed a bottom bunk assignment due to his history of seizures, falling, and "inability to ambulate on his own." ECF 4 at 14.  Davidson states that he had to rely on other inmates to help him move from his bed to the wheelchair.  *Id.* at 5.  He claims he was provided a defective wheelchair; it did not lock and spun when he tried to sit in it.  ECF 4 at 6.  Davidson faults Tedla for refusing to provide him certain medications recommended by the neurologists at UMMC.  *Id.* at 8.

Davidson states that he filed complaints against Drs. Ali and Tedla with the Maryland Board of Physicians, *id*. at 3, 5, and in retaliation for filing these complaints, Tedla had him released from UMMC to BCBIC without being cleared to walk by the physical therapy ("PT") or neurology departments, refused to place a medical order for nurses to assist him when transferring from bed to his walker, and did nothing when Davidson informed him about the defective wheelchair.  *Id.* at 5, 7-8.  As relief, Davidson requests $1 million in punitive damages. ECF 4-1 at 3.

In later filed correspondence, Davidson added the Baltimore City Police Department, Officer Eugene Early, and Officer Green as defendants, alleging the officers used excessive force against him.  ECF 4 at 11, ECF 9.  Efforts to obtain service of process on these individuals have been unsuccessful, and the claims against them will be dismissed without prejudice. ECF 11, 18, 19, 31,[7] 32.  As to the Baltimore City Police Department, "[a] municipality, including a police department such as the BPD, cannot be held liable in a Section 1983 action under a theory of respondeat superior." *Corbitt v. Baltimore City Police Department*, Civil Action No. RDB-20-

---

[7] Counsel provided the officers' address under seal as directed by the Court.  Service was attempted on Officer Early at his last known address.  No address for Officer Green was found, and counsel suggests that Davidson may have mistaken "Officer Green" for an officer with a different name.  ECF 28, 31, 32.

3431, 2021 WL 3510579 (August 10, 2021) citing *Monell v. Dept. of Social Services,* 436 U.S. 658, 693-94 (1978).   A local government body may be liable under Section 1983 for unconstitutional conduct of individual defendants if those defendants were executing an official policy or custom of the local government when they violated a plaintiff's rights. 436 U.S. at 690. Such claims are brought against a municipality for its "own illegal acts."  *Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986) (citing *Monell,* 436 U.S. at 665-83), and Davidson does not present such claims here.  Accordingly, the claims against the Baltimore City Police Department are dismissed.

## II.  STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do")).

The purpose of Rule 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted). When deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint[,]" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,

637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). The Court need

not, however, accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d

870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*,

478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual

events, *see United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Defendants' Motions are styled as Motions to Dismiss or, in the Alternative, Motions for

Summary Judgment.  If the Court considers materials outside the pleadings, the Court must treat a

motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the court treats a

motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable

opportunity to present all the material that is pertinent to the motion." *Id*. When the moving party

styles its motion as a "Motion to Dismiss or, in the Alternative, for Summary Judgment," as is the

case here, and attaches additional materials to its motion, the nonmoving party is, of course, aware

that materials outside the pleadings are before the Court, and the Court can treat the motion as one

for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61

(4th Cir. 1998). Further, the Court is not prohibited from granting a motion for summary judgment

before the commencement of discovery.  *See* Fed. R. Civ. P. 56(a) (stating that the court "shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact" without distinguishing pre-or post-discovery).

Summary judgment is appropriate if "materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . . ,

admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is

"no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party

moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted). When ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. In general, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. *Celotex,* 477 U.S. at 324; Fed.R.Civ.P. 56(e). A verified complaint is the equivalent of an opposing affidavit for summary judgment purposes when the allegations contained therein are based on personal knowledge. *Davis v. Zahradnick,* 600 F.2d 458, 459–60 (4th Cir.1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment)

While the Court may rule on a motion for summary judgment prior to commencement of discovery, *see, e.g.*, *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000), Federal Rule of Civil Procedure 56(d) "mandates that summary judgment be denied when

the nonmovant has not had the opportunity to discover information that is essential to his opposition." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (internal citation and quotation marks omitted). To obtain Rule 56(d) relief, the non-moving party bears the burden of showing how discovery "could possibly create a genuine issue of material fact sufficient . . . to survive summary judgment, or otherwise affect the court's analysis." *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015) (internal citation and quotation marks omitted).

Where, as here, the plaintiff is proceeding pro se, the Court reads the pleadings generously. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  At the same time, the Court must fulfill its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted).

### III. DISCUSSION

The Fourteenth Amendment's Due Process Clause protects the rights of pretrial detainees to receive adequate medical care.  *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating that "the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care" [to] pretrial detainees "who require it") (citation omitted); *Hill v. Nicodemus*, 979 F.2d 987, 990-91 (4th Cir. 1992).[8] The United States Court of Appeals for the Fourth Circuit has held that the Eighth Amendment deliberate indifference

---

[8] In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court called into question the equivalence between the standards applied to claims by pretrial detainees and convicted inmates. The Court said that, unlike the standard applied to post-conviction excessive force claims under the Eighth Amendment, the standard for pretrial detainees' excessive force claims under the Fourteenth Amendment does not include a subjective component. *Id.* at 296-97. Several circuits have extended this reasoning to hold that the standard for claims of pretrial detainees alleging inadequate medical care under the Fourteenth Amendment should not include a subjective component. *See e.g. Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cty. of Orange*, 888 F.3d 1118,1124-25 (9th Cir. 2018). In the Fourth Circuit, including courts in this district, courts have declined to extend *Kingsley* to claims of deliberate indifference to a serious medical need. *See e.g. Perry v. Barnes,* No. PWG-16-705, 2019 WL 1040545, at *3 n.3 (D. Md. Mar. 5, 2019); *Mays v. Sprinkle*, No. 7:18CV00102, 2019 WL 3848948, at *1 (W.D. Va. Aug. 15, 2019); *Wallace v. Moyer*, CCB-17-3718; 2020 WL 1506343 at 6 *n. 9.

standard applies to Fourteenth Amendment claims by pretrial detainees for inadequate medical treatment. *Id.* at 991-92 ("[P]rison officials violate detainee's rights to due process when they are deliberately indifferent to serious medical needs." (citations omitted)); *see also Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001) ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."). Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th. Cir. 2014).

To establish deliberate indifference, a plaintiff must satisfy a two-part inquiry that includes both an objective and a subjective component. *See Raynor v. Pugh*, 817 F.3d 123, 127 (4th. Cir. 2016). First, a plaintiff must show objectively "a serious deprivation" of rights "in the form of a serious or significant physical or emotional injury," *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014), or "a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions," *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). To establish the subjective component, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson v. Seiter*, 501 U.S. 294, 302-303 (1991) (applying the deliberate indifference standard to conditions of confinement claims).

Medical Defendants argue that claims against them must be dismissed for failure to state a claim or they are entitled to summary judgment as a matter of law because Davidson was provided constitutionally adequate medical care. The court will address the claims against each Medical Defendant in turn.

### A. Corizon

Davidson presents no specific allegations against Corizon, a private corporation that provides medical services to Maryland inmates under contract with the State. Rather, it appears that he seeks to hold Corizon liable for the actions of its employees. *Respondeat superior*, the doctrine that holds an employer liable for the wrongful actions of an employee or agents, does not apply in § 1983 actions. *See Monell*, 436 U.S. at 690; *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no *respondeat superior* liability under § 1983).

To the extent Davidson intends to hold Corizon responsible based on supervisory liability, his claim fares no better. Supervisory liability "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir. 1984)). To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Davidson does not plead or demonstrate facts sufficient to show supervisory indifference to, or tacit authorization of, any misconduct by Corizon's employees, and the Motion to Dismiss

will be granted as to Corizon.  His allegations do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability.  Moreover, as discussed below, Davidson also has failed to show the Medical Defendants acted with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment.  Accordingly, the claims against Corizon will be dismissed.

### B.  Dr. Sadik Ali

Davidson alleges that Dr. Ali returned him to BCBIC without alerting staff to his pain and difficulty walking.  ECF 4 at 14.  Ali disputes Davidson's claims that he had paralysis, needed a wheelchair, or that his medical needs were unaddressed. Declaration of Sadik Ali, ECF 20-2 at 2.  The Medical Defendants also have filed verified copies of Davidson's medical records.  Because Davidson's complaint is unverified, its factual assertions may not be considered as evidence in opposition to the Medical Defendants' motion.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); Fed. R. Civ. P. 56(c)(1)(A).

According to the verified medical records, Davidson was seen by a nurse for a reported fall from his bunk on February 28, 2019.  The nurse observed he was on the floor, alert and oriented. He told officers that he had fallen from his bunk and could not feel his legs. Medical Records, ECF 20-6 at 449.  That same day, Dr. Oluyemi Abiodun examined Davidson.  Davidson told Abiodun that he could not feel his arms and legs.  Abiodun observed Davidson was able to move his arms and use them to lift himself up with minimal assistance, although he was "adamant that he was unable to move his legs." *Id.* at 446.  Davidson denied a history of seizures. *Id.*  Abiodun placed an order to send Davidson to the emergency room.  *Id.* at 447.  The nurse had called the ambulance at noon and was informed that they could not arrive until around 4:00 PM at the earliest. *Id.*  At 3:36 PM, a nurse noted Davidson was waiting for the ambulance and was in no acute distress.  *Id.*

at 432.

Davidson was admitted to UMMC, where he reported lack of sensation below the clavicles and was unable to move. ECF 20-3 at 264.  While he was at UMMC, Davidson had no difficulty communicating, spoke in complete sentences and received a range of diagnostic tests.  *Id.*  None of the tests showed broken bones or fractures or abnormal brain function.  Davidson's musculoskeletal system displayed normal range of motion. ECF 20-3 at 265.  The spine had no tenderness to palpation, there was no cranial nerve deficit, he exhibited no response to painful stimuli, and he displayed 0/5 motor strength in his arms and legs.  He was, however, seen to move his toes and his arm.  *Id.*  X-rays showed no fractures.  *Id.* at 266-73.  CT scans of the head, lumbar spine, cervical spine, thoracic spine, chest, and abdomen revealed no fractures or hemorrhage.  *Id.* at 50-53.  An MRI of the cervical spine showed disc bulges and foraminal stenosis.  *Id.* at 47.  An MRI of Davidson's brain returned normal findings.  *Id.* at 56-57.  Medical consultations were ordered with the neurology, neurosurgery, and physical therapy departments.  Neurology recommended an EEG and psychiatric evaluation.  The EEG was negative for seizures.  *Id.*  Neurosurgery made no further recommendations.  *Id.*

In Davidson's discharge papers, UMMC recommended a physical therapy consultation for Davidson because he might require physical rehabilitation after discharge.  ECF 20-3 at 273.  Additional recommendations were to prescribe Prazosin for post-traumatic stress disorder ("PTSD") and following up with outpatient psychiatry.  *Id.*  It was also recommended that Davidson continue using Tegretol given his unclear history of bipolar disorder.  *Id.*  The discharge papers also noted that physical therapy had reevaluated Davidson at UMMC and found he could safely walk around with a standard walker.  *Id.* at 273.  Psychiatry had found a likely diagnosis of conversion disorder.  *Id.*  Ali describes conversion disorder as a "mental condition in which a

person has blindness, paralysis, or some other neurologic symptoms that cannot be explained by a medical evaluation" for which the exact cause is unknown but may be the result of extreme stress, emotional trauma, or depression.  Ali Decl. ECF 20-2 at 5.  UMMC records indicate that Davidson was being discharged to the Metropolitan Transition Center infirmary to evaluate his appropriate prison infirmary placement.  ECF 20-3 at 275.

On March 7, 2019, Davidson was discharged from UMMC and admitted to the MTC infirmary. ECF 20-3 at 278.  On March 8, 2019, a nurse practitioner who examined him observed that he was able to move his extremities.  ECF 20-6 at 404.  Davidson demanded to be discharged from the infirmary and insisted on placement in a single cell.  *Id.*  The nurse practitioner observed Davidson walked very stiffly.  He reported using a walker since his admission to UMMC.  *Id.* Examination revealed Davidson's neurological function was intact, his lower extremities were normal, he could raise his knees against pressure while supine, and his hip extension was strong against pressure.  *Id.* at 405.  Davidson could lower his leg and curl his toes against resistance. Dorsiflexion of the foot was 5/5 and symmetric.  *Id.*  Plantar flexion of the feet was intact, and Davidson could stand on his tiptoes.  *Id.*  Davidson was prescribed Motrin for pain and Tegretol for mood regulation.  *Id.*

Ali saw Davidson on March 11, 2019, in the MTC infirmary.  ECF 20-6 at 378.  Ali noted that Davidson was diagnosed at UMMC with conversion reaction, Todd's paralysis of the legs,[9] and recommended continuation of Tegretol for seven more days for mood stabilization.  *Id.* Davidson's imaging studies and labs were unremarkable, except for a small left C5-6, C6-7, C7-T1 foraminal disc bulge, and he was to follow up with neurology if he were to develop LUE (left upper extremity) radicular pain.  *Id.*  Ali reported Davidson was hostile and agitated, wanted

---

[9]  Ali explains that "Todd's paralysis" is a neurological condition experienced by individuals with epilepsy in which a seizure is followed by a brief period of temporary paralysis for between 30 minutes to 36 hours. ECF 20-2 at 6.

analgesics and sedatives, but was eating, drinking, and walking well. Ali prescribed ibuprofen and Tylenol for pain. *Id*.

On March 12, 2019, Ali saw Davidson in the MTC infirmary. ECF 20-6 at 367. Ali described the physical exam as unremarkable except for questionable bilateral lower extremity ("BLE") weakness, which he suggested might be attributable to Davidson's "noncooperation." *Id.*

On March 13, 2019, Ali discharged Davidson from MTC to BCBIC. ECF 20-3 at 279-80; ECF 20-6 at 355-58. Ali noted that Davidson wanted to use a walker, was responding well to conservative therapy, and his physical examination was unremarkable except for questionable leg weakness, "which I believed was most likely deliberate." ECF 20-3 at 279; *see also* Ali Decl. ECF 20-2 at 7. Ali described Davidson as:

> uncooperative to elicit full neurologic functions; however, he was observed to walk with and without a walker. I noted that clinically, he was very stable. Therefore, he could be discharged with medications and discharge instructions. This was my last examination of the patient, although I participated in some multidisciplinary care meetings regarding the patient and have reviewed his subsequent medical records.

Ali Decl. ECF 20-2 at 7. (citations to medical record omitted).

Davidson was sent to BCBIC on March 13, 2019, where he was examined by Dr. Bai Kanu and readmitted to MTC. ECF 20-6 at 352, 354. Kanu noted Davidson was unable to transfer from one location to another without assistance and was unable to walk without assistance. Kanu assessed Davidson as having paraplegia, epilepsy, (Davidson claimed to have suffered a seizure that morning), and neuropathy. *Id.* Kanu ordered a wheelchair for Davidson. *Id.*

Ali disagrees with Kanu's assessment and diagnosis. Ali Decl. ECF 20-2 at 8. Ali notes that on the day he returned to BCBIC, March 13, 2019, Davidson was observed by a nurse and custodial staff walking with his walker. ECF 20-2 at 8; *see also* ECF 20-6 at 349. Ali states that Davidson was a difficult patient to manage, "with likely malingering and manipulation as he

14

abused staff verbally." Ali Decl. ECF 20-2 at 12.  Ali opines that during the "brief time in March 2019 when I was involved in his care, there was no indication to me that the patient had any serious medical need." Ali further notes that UMMC had confirmed Davidson could walk safely with a walker and was found to have full neurologic function while at MTC.  *Id.*  In Ali's view, Davidson did not need a wheelchair and was prescribed sufficient pain medication.  "I did not believe there was any reason for him to remain in the infirmary at MTC; thus, I discharged him." *Id.*  Moreover, Ali in fact alerted BCIBC staff to Davidson's medical history, including results of his recent diagnostic tests, conservative pain management, reported weakness in his lower extremities, and advised that Davidson was clinically stable.  *Infra* p. 13.  The disagreement between Dr. Ali and Dr. Kanu is insufficient to establish deliberate indifference to Davidson's serious medical needs. The fact that medical professionals may disagree on a recommended course of treatment does not establish deliberate indifference.  *Jackson,* 775 F.3d at 178.  In *Jackson,* the United States Court of Appeals for the Fourth Circuit found no deliberate indifference when a general practitioner failed to diagnose a serious heart condition and altered the treatment plan, even though a cardiologist had previously diagnosed the condition and treated the prisoner for it.  *Id.*  Even though the second doctor's approach "might support a medical malpractice claim" and "may have been mistaken, even gravely so," the court concluded that the claim was essentially a disagreement between an inmate and a physician over the inmate's proper care.  *Id.*  Such disagreement falls "short of showing deliberate indifference."  *Id.*  In the absence of evidence that Ali acted with reckless disregard to a known and substantial risk to Davidson's health and safety to base a constitutional claim for deliberate indifference there is no genuine issue of material fact in dispute.

## C.  Dr. Tadesse Tedla

Davidson asserts Dr. Tedla: (1) refused to see him immediately after he fell and sprained

his ankle; (2) refused to order nurses to help him transfer to his walker or wheelchair; (3) refused

to order a wheelchair as initially recommended by PT at the hospital; (4) refused to order a

replacement for his defective wheelchair; and (5) transferred him back to BCBIC when he was not

cleared to walk.  ECF 3 at 3; ECF 4 at 3-9.  Tedla disputes these allegations, stating:

> I never ignored [Davidson's] medical needs or retaliated against him.  I do
> not believe he needed assistance from nurses in transfers and mobility
> because he was observed walking with and without a walker. When the
> hospital recommended a wheelchair on March 28, 2019, [Davidson] was
> provided one. I requested a wheelchair with a footrest on April 3, 2019.

Declaration of Tadesse Tedla, ECF 20-7 at 15.  Further, like Dr. Ali, Tedla doubts Davidson's

symptoms were due to conversion disorder.  Tedla explains "[w]ith conversion disorder, the patient

may demonstrate paralysis with unknown physical etiology, but the paralysis would be

consistently present."  *Id.*  Tedla states that Davidson, "was observed walking with and without a

walker, which he would be unable to do if he truly had conversion disorder."  *Id.*  Considering

these observations and the lack of any medical evidence that Davidson has a seizure disorder,

Tedla opines malingering is more likely.  *Id.*

Tedla summarizes relevant portions of Davidson's medical records as follows.  On March

15, 2019, Tedla noted on the medical record that physical therapy had been recommended for

Davidson after discharge from the hospital.  Tedla reported Davidson was seen by nursing staff

walking normally when he did not know he was being observed.  Tedla Decl. ECF 20-7 at 8; ECF

20-6 333, 335, 339, 349.  Tedla submitted a request for onsite PT and a psychiatric consultation as

recommended at UMMC.  ECF 20-6 at 333.  Also, on March 15, 2019, a nurse reported seeing

Davidson walking with a walker and that he called for nurses to lift him up from sitting to a

standing position.  ECF 20-7 at 8; ECF 20-6 at 331.  Tedla states there was "no physical reason"

for Davidson to begin suddenly needing nurses to assist him to stand.  ECF 20-7 at 8.

On March 17, 2019, Davidson was observed walking without difficulty with a walker and carrying a bag of clothes.  ECF 20-3 at 41.  He was also observed making a phone call without assistance, turning and walking without losing balance, and walking with a normal gait and pace. *Id*.

On March 18, 2019, Tedla saw Davidson in the infirmary for complaints of difficulty walking, severe neck and back pain, and ineffective pain relief provided by Tylenol.  ECF 20-6 at 298.  Tedla noted that Davidson was seen walking with a standard walker.  *Id*.  Tedla prescribed a short course of Toradol and Elavil for pain relief.  *Id.*

On March 22, 2019, a nurse observed Davidson walking unassisted.  ECF 20-6 at 264. That evening, Tedla commented in the medical chart that malingering could not be ruled out. ECF 20-7 at 9; ECF 20-6 at 260. Tedla added Baclofen to Davidson's pain management medication regimen for his complaints of pain, including muscle spasms.  Tedla noted that Davidson was scheduled to begin physical therapy the following week.  ECF 20-6 at 260.

On March 24, 2019, Dr. Jocelyn El-Sayed saw Davidson during infirmary rounds.  She reported Davidson "ambulates with a walker, able to go to the bathroom, perform his ADLs (activities of daily living)" and was "able to make a phone call without assistance."  ECF 20-6 at 249.

On March 25, 2019, a nurse observed Davidson walking without a walker and standing by a window looking outside.  *Id*. at 243. Tedla changed Davidson's Toradol prescription to Motrin to minimize gastrointestinal side effects.  *Id.* at 236.

On March 26, 2019, Davidson refused the PT evaluation.  ECF 20-6 at 328-29.  That evening, a nurse observed him walking without a walker.  ECF 20-6 at 227.  Tedla also saw Davidson that evening on infirmary rounds.  *Id*. at 224.  Tedla states "I do not recall ever being

contacted on March 27, 2019 and being told [Davidson] had fallen.  If I was told he had fallen and

was seriously injured I would have examined him." ECF 20-7 at 10.

On March 28, 2019, Dr. Jocelyn El-Sayed examined Davidson who reported that he had

lost his balance and fallen on the previous night.  Davidson presented complaints of pain in his left

foot and ankle.  El-Sayed observed that Davidson's leg was significantly swollen, called Tedla

who reported the swelling was new, and El-Sayed sent Davidson to the emergency room at

UMMC. ECF 20-6 at 208.  At UMMC, Davidson was diagnosed with a left ankle sprain, a nerve

disorder causing arm pain, and spinal osteoarthritis with radiculopathy, cervical region.  ECF 20-

3 at 243-55.  X-rays of his left ankle and foot showed no fracture or dislocation.  *Id*.  Davidson had

an MRI of the cervical spine, which showed no significant change from his previous MRI.  *Id*. at

251.  Neurosurgery recommended a steroid dose pack and Gabapentin for ongoing symptoms.  *Id*.

Davidson was discharged with a cervical collar and recommended for a wheelchair, which Tedla

opines were not needed.  Tedla Decl. ECF 20-7 at 11; ECF 20-6 at 197.  The discharge record also

noted that Davidson had been evaluated by PT during his previous admission and a wheelchair

was recommended.  *Id*.  Tedla states the hospital discharge summary was incorrect with respect to

its statement that Davidson had been evaluated by PT during his previous admission and a

wheelchair was recommended.  *Id*.  Tedla's statement is supported in the record.  Tedla accurately

notes that during Davidson's previous admission he was reevaluated by PT and determined to be

able to walk safely with a walker. ECF 20-7 at 11; ECF 20-3 at 273 (discharge report from first

admission reporting Davidson "can walk safely with a standard walker").

On March 29, 2019, Tedla noted "a very small amount of swelling on Davidson's left leg

such that I would have not sent him to the hospital the previous night," Tedla Decl. ECF 20-7 at

11; *see also* ECF 20-6 at 197.  Davidson told Tedla that he wanted to be treated in the hospital not

in the infirmary, and Tedla informed him that patients go to the hospital for acute not chronic problems. ECF 20-6 at 197.  Davidson agreed to see a physical therapist onsite.  *Id.*  Tedla planned to continue Davidson's pain management.  *Id.*  Tedla also provided a knee compression stocking for Davidson's left leg "even though [Tedla] did not see significant edema." *Id.*

On March 31, 2019, Dr. Donna Myers examined Davidson in the infirmary for complaints of a swollen left foot.  ECF 20-6 at 178.  Davidson told her that he needed a wheelchair but his was broken (which she noted it was), other inmates had to help him walk, and he demanded to be taken back to the hospital because of the swelling and pain.  *Id.*  Myers tried to find another wheelchair but there were none available.  *Id.*  She wrote that she would request one for Davidson. *Id.*  That evening, a nurse saw Davidson walking without a wheelchair within the infirmary but using a wheelchair to get to the telephone in the hallway. *Id.* at 175.  Davidson wore an ace wrap on his left foot and a cervical collar on his neck.  *Id.*  Davidson had a new medication order for a tapered course of Prednisone. *Id.*

On April 1, 2019, Tedla saw Davidson in the infirmary. *Id.* at 164. Tedla diagnosed Davidson with disc degeneration.  Although Davidson had refused his earlier physical therapy evaluation, Tedla noted that he would be given a second opportunity for evaluation. *Id.*; Tedla Decl. ECF 20-7 at 12. Davidson threatened Tedla that he knew his name and car tag. *Id.* Tedla reported the threat to security personnel. *Id.*

On April 2, 2019, Davidson was evaluated for physical therapy.  ECF 20-3 at 183-85. The physical therapist noted it was difficult to assess Davidson's full range of motion, strength, or function due to his unwillingness to move his extremities or trunk due to complaints of gross acute pain throughout his body with the slightest movement.  *Id.* at 185.  The physical therapist was unable to adequately assess strength due to the patient's unwillingness to allow manual resistance

to trunk or extremities, but observed Davidson was able to move his arms to talk on the telephone, propel his wheelchair without difficulty, and reach for and support the food tray given him by the therapist after assessment. *Id.* at 184. The physical therapist recommended additional physical therapy for Davidson. *Id.* at 185. Tedla saw Davidson later that day, noting that Davidson was in a wheelchair and wearing a "self-imposed" cervical collar. Tedla Decl. ECF 20-7 at 13; ECF 20-6 at 157. Tedla continued Davidson's orders for pain management and physical therapy. *Id.*

On April 3, 2019, Davidson complained to Tedla about difficulty walking. Tedla determined Davidson "was probably malingering" because he walked normally when unaware he was being observed. ECF 20-7 at 14; ECF 20-6 at 137. Davidson was prescribed a steroid (Medrol) dose pack as recommended as per neurosurgery during his last ER visit. Additionally, Tedla requested a wheelchair with a footrest recommended by the hospital and filed a request for a neurosurgery consultation. ECF 20-7 at 14; ECF 20-3 at 64.

On April 4 and 5, 2019, Davidson refused physical therapy. ECF 20-7 at 14; ECF 20-3 at 173, 190, 239. Because Davidson refused physical therapy three times, Tedla discharged him from MTC and sent him to the ADA/wheelchair housing area BCBIC. ECF 20-7 at 14; ECF 20-3 at 261, 180; ECF 20-6 at 127-28. Davidson had insisted on using a wheelchair and wearing a cervical collar and when the physical therapist advised him to remove the collar, he refused. *Id.* Tedla opined that Davidson was probably using the wheelchair and collar for secondary gain, noting that he had twice refused physical therapy and was refusing all medications. *Id.*

On April 5, 2019, Dr. Michael Agonafir at BCBIC noted Davidson had a history of chronic back pain due to foraminal stenosis, was refusing care and medications and otherwise was able to wheel to the phone booth and complete his activities of daily living ("ADLs") by himself. ECF 20-6 at 110. Examination revealed no spinal tenderness or motor weakness. *Id.* Agonafir noted

Davidson was approved and scheduled for examination in the neurosurgery clinic the following week. *Id.* [10]  The examination found Davidson's spine was negative for tenderness. *Id.* Agonafir discussed the case with Tedla and decided to keep Davidson in the wheelchair-accessible housing at BCBIC with daily review at the dispensary. *Id.*

In view of the information in Tedla's declaration and Davidson's medical records, even reviewing the evidence in the light most favorable to Plaintiff, as a matter of law, Tedla did not act with deliberate indifference to Davidson's serious medical needs and did not unlawfully retaliate against Davidson. Tedla attests that he does not recall ever being contacted on March 27, 2019 regarding Davidson's fall; that Davidson did not need nursing assistance in transferring to his walker or wheelchair; and that after Davidson's first discharge from UMMC he could walk safely with a walker.  Later, after Davidson was provided a wheelchair, Tedla wrote an order for a wheelchair that had a footrest.  In Tedla's opinion, Davidson did not need to be at MTC because he refused to partake in the physical therapy provided at MTC.  Instead, Davidson was transferred to a unit at BCBIC to accommodate his wheelchair. Tedla's opinions were informed by objective evidence including diagnostic tests as well as physical examination of the patient, and observations from others.  Despite Tedla's suspicions that Davidson was malingering, Tedla prescribed pain medications, a wheelchair with a footrest, compression socks, and physical therapy to address Davidson's complaints.  Davidson's disagreement with Tedla over the course of his medical care and diagnosis falls far short of showing deliberate indifference.  *See Jackson*, 775 F.3d at 178 .

---

[10]  In his declaration, Dr. Ali states that Davidson refused to go to his neurology appointment, so a new neurology appointment was confirmed for June 17, 2019. ECF 20-2 at 8-9.  On May 28, 2019, a multidisciplinary care meeting was held to discuss Davidson's refusal to communicate with medical staff and his threats to sue staff members. *Id.* at 8; ECF 20-5 at 414.  Medical staff were encouraged to work with Plaintiff at 7 AM, 2 PM, and between 9-10 PM. Medical was to communicate with the neurologist to ascertain Plaintiff's muscular strength and the need to continue with physical therapy. ECF 20-ECF 20-5 at 415. At the end of the conference, the medical team asked Davidson to discuss the plan of care, but Davidson refused. *Id.*

### D. Retaliation and Negligence Claims

To state a retaliation claim, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994). Retaliation, though it is not expressly referred to in the Constitution, is actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Where there is no impairment of a plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim. *ACLU of Md., Inc. v. Wicomico Cty, Md.,* 999 F.2d 780, 785 (4th Cir. 1993). Having concluded that Ali and Sadek are entitled to summary judgment in their favor with respect to Davidson's claims of constitutionally inadequate care, Davidson's assertions of inadequate care in retaliation for filing a complaint with the Maryland Medical Board are necessarily unavailing. Even if this allegation were viewed as a First Amendment retaliation claim, Davidson fails to allege or provide facts to support such a claim. *See Constantine v. Rectors & Visitors of George Mason Univ*., 411 F.3d 474, 499 (4th Cir. 2005) (outlining requirements).

To the extent Davidson alleges Defendants have committed negligence, a claim arising under state law, the court declines to exercise supplemental jurisdiction, and will dismiss the state claims without prejudice. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over state law claims when "the district court has dismissed all claims over which it has original jurisdiction."); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966)).

### IV. CONCLUSION

For the foregoing reasons, the Medical Defendants' Renewed Motion to Dismiss or, in the

Alternative, Motion for Summary Judgment (ECF 51).  The Baltimore City Police Department is dismissed and the claims against Officers Eugene Early and Green are dismissed without prejudice.  A separate Order follows.


February 10, 2022                              _____/s/_____
Date                                                   GEORGE J. HAZEL
                                                         United States District Judge